UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ANGELA R. PERREN,               )
                                )
          Plaintiff,            )
                                )
     v.                         )   Case No. 1:10CV190 FRB
                                )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,             )
                                )
          Defendant.            )

## MEMORANDUM AND ORDER

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural Background

On September 10, 2007, plaintiff Angela R. Perren ("Plaintiff") protectively filed an application for Disability Insurance Benefits ("DIB") alleging disability as of July 15, 2007. (Administrative Transcript ("Tr.") at 118-24). Plaintiff's application was initially denied, and she requested a hearing before an administrative law judge ("ALJ"). (Tr. 65-66). On February 17, 2010, a hearing was held before ALJ Stephen M. Hanekamp, during which Plaintiff was represented by counsel and testified on her own behalf. (Tr. 26-53). On April 29, 2010, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 7-21). Plaintiff sought review of the ALJ's decision with

-1-

defendant Agency's Appeals Council, (Tr. 4), but on October 18, 2010, the Appeals Council denied Plaintiff's request for review. (Tr. 1). The ALJ's decision thus stands as the Commissioner's final decision. 42 U.S.C. § 405(g).

## II. Evidence Before The ALJ

### A. Plaintiff's Testimony

During Plaintiff's administrative hearing, she was in Florida with her attorney, and the ALJ was in a hearing room in Saint Louis, Missouri, and the auditory portion of the proceedings were recorded. (Tr. 28-29). Plaintiff testified that she was born in December of 1966, and had a Bachelor's degree in Music and Registered Nursing training. (Tr. 31). Plaintiff testified that her nursing license had expired in 2007 when she stopped working. (Id.) Plaintiff was married, but had no children. (Tr. 32). She testified that she was five feet, two inches tall, and weighed 230 pounds. (Tr. 40).

Plaintiff testified that she had held ten to fifteen jobs as a Registered Nurse ("RN"), and that all but her last employer had been satisfied with her work. (Tr. 34-35). She testified that she was terminated from her last RN job because her employer "felt [she] was unsafe in the work environment with [her] bipolar disorder." (Tr. 34). Plaintiff testified that she was hospitalized in August of 2007, and at work was simply unable to complete her duties due to poor concentration. (Id.) She explained that she was hospitalized after her fiancé took her to the hospital because she "had insomnia" and was "on a manic high."

(Tr. 34). Plaintiff testified that she had not been to the
hospital for psychiatric reasons before or since. (Tr. 35).
Plaintiff testified that she was taking Geodon,[1] Celexa,[2]
Acyclovir,[3] and vitamin and mineral supplements. (Id.) She
testified that her medications helped but that she still had a lot
of problems with depression, and also stated that Geodon made her
groggy. (Tr. 36).

Plaintiff testified that she went to bed at night at
10:30 and fell asleep pretty quickly, and woke at 5:30. (Id.) She
testified that she did not rest well at night, and slept on and off
throughout the day. (Id.) Plaintiff testified that she could
watch television for approximately one hour before falling asleep,
and could read for about 30 minutes. (Tr. 37). She testified that
she did laundry for herself and her husband and cooked meals for
herself and her husband and her mother, but that was all. (Id.)
She testified that her brother did the cleaning and yard work.
(Id.) Plaintiff testified that she socialized with friends once or
twice per year and went to church on Sundays, but did not belong to
any clubs or social organizations. (Tr. 37-38). Plaintiff

---

[1]Geodon, or Ziprasidone, is used to treat the symptoms of schizophrenia,
and is also used to treat episodes of mania in patients with bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html

[2]Celexa, or Citalopram, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html

[3]Acyclovir is used to decrease pain and speed the healing of sores or
blisters in people who have varicella (chickenpox), herpes zoster (shingles; a
rash that can occur in people who have had chickenpox in the past), and first-
time or repeat outbreaks of genital herpes (a herpes virus infection that causes
sores to form around the genitals and rectum from time to time). Acyclovir is
also sometimes used to prevent outbreaks of genital herpes in people who are
infected with the virus.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681045.html

testified that she had two Chihuahuas.  (Tr. 38).

The ALJ noted that Plaintiff had a good career as an RN from 1995 to 2007, and asked Plaintiff what happened.  (<u>Id.</u>) Plaintiff explained that, right before her breakdown, she was the victim of a stalker.  (<u>Id.</u>)  Plaintiff explained that her across-the-street neighbor was calling her and threatening her, and that the police tracked his telephone records and arrested him, and that her insomnia and hyperactivity then began.  (<u>Id.</u>)  Plaintiff testified that her neighbor was arrested, but that she did not know whether he was ever prosecuted.  (Tr. 38).

Plaintiff then responded to questions from her attorney. Plaintiff testified that she took two or three naps every day, each of which lasted for 30 to 60 minutes.  (Tr. 39).  She stated that she lacked initiative, and that her mother had to tell her to do everything.  (<u>Id.</u>)  Plaintiff testified that she saw a doctor in Tennessee, and was "trying to get doctors here" but that doing so was difficult without insurance.  (<u>Id.</u>)

Plaintiff testified that, in addition to her mental problems, she had a history of back surgery and a 20-pound lifting limit that prevented her from working as an RN.  (Tr. 40). Plaintiff testified that she underwent back surgery in 1992, and worked for many years afterward.  (<u>Id.</u>)  She testified that she was not currently receiving treatment for back problems, but that she does see a doctor when her back "acts up on [her] a couple of times a year."  (<u>Id.</u>)  Plaintiff testified that this doctor, Dr. Solkowski, gave her Motrin when her back acted up.  (<u>Id.</u>)

-4-

Plaintiff testified that she had gastric bypass surgery and lost 150 pounds, but then gained 50 pounds. (Tr. 40).

Plaintiff testified that she had chronic back pain which she described as a constant nagging that worsened when she pulled her back, walked, or lifted. (Tr. 41-42). Plaintiff rated her back pain as four or five on a one-to-ten scale. (Id.) Plaintiff testified that she took Motrin when she had back problems. (Tr. 42). She stated that she could walk for only 30 minutes before her legs started to give out; could sit for only 30 to 60 minutes due to stiffness in her back; and could climb only ten steps before stopping to rest. (Tr. 42-43). She stated that she had chronic bronchitis, and explained that she got bronchitis two or three times per year and had been told that she was on the path towards emphysema. (Tr. 43-44). Plaintiff testified that she smoked one-half of a pack of cigarettes per day, and had tried without success to quit. (Tr. 44).

Plaintiff testified that she did not feel she could work because she had poor concentration and poor memory and could not stay on task for longer than five or ten minutes, and because she slept on and off throughout a 24-hour period. (Id.)

Plaintiff testified that she saw Ahmed Farooque, M.D., a psychiatrist, every six months. (Tr. 45). Plaintiff testified that her mother drove her to her appointments with Dr. Farooque, whose office is located in Tennessee and is a six-hour drive from Plaintiff's house. (Id.) Plaintiff stated that she had driven herself to the administrative hearing, a nearly two-hour drive,

because her mother had a broken leg. (Id.)

The ALJ then heard testimony from John S. Dolan, a vocational expert ("VE"). Mr. Dolan classified Plaintiff's past work as medium in skill and exertional level, and heavy as Plaintiff described it. (Tr. 47). After considering hypotheticals posed by the ALJ, Mr. Dolan gave examples of jobs such individuals could perform, such as security guard, mail room clerk, or library aide. (Tr. 47-48).

B.   Medical Records

Medical records from Thomas Sulkowski, M.D. indicate that Plaintiff was seen on June 30, 2003 for examination related to diabetes. (Tr. 460). It was noted that Plaintiff was morbidly obese but was otherwise well-appearing, and examination was essentially normal. (Tr. 460-61). She returned on September 24, 2003 for reflux esophagitis, allergic rhinitis, and diabetes follow-up. (Tr. 456-58). She was seen again on October 14, 2003 for bronchitis and sinusitis, (Tr. 453-55), and on February 17, 2004 for sinusitis. (Tr. 449-52). On April 2, 2004, Plaintiff saw Dr. Sulkowski with complaints of palpitations and chest pain. (Tr. 440). Examination, including an EKG, was normal, but Plaintiff was referred to a cardiologist. (Tr. 441-42).

Plaintiff returned to Dr. Sulkowski on April 23, 2004 with complaints of an ankle sprain and contusions on her left leg and knee secondary to a fall. (Tr. 437). Testing revealed no fracture. (Tr. 438). Plaintiff returned on May 10, 2004 for follow-up. (Tr. 434). Mild swelling was noted, and plaintiff was

instructed to stay as active as possible and to use over-the-counter pain relievers. (Tr. 436). On June 1, 2004, plaintiff saw Dr. Sulkowski with complaints of left knee pain and instability, and was referred to an orthopedist. (Tr. 431-33).

On July 8, 2004, Plaintiff visited Dr. Sulkowski's office with complaints related to gastroesophageal reflux disease ("GERD"), allergic rhinitis and diabetes follow-up. (Tr. 427). On August 16, 2004 she presented with complaints of back pain after bending over while carrying groceries. (Tr. 424). Plaintiff was given prescription pain medication, and told to seek treatment immediately in the event of any numbness, weakness or change in bowel or bladder control. (Tr. 426).

Plaintiff returned to Dr. Sulkowski's office on August 31, 2004 for follow-up, stating that her symptoms had improved significantly. (Tr. 421). It is noted that she was reassured "about the apparent lack of serious clinical implications evident after today's evaluation of the complaints." (Tr. 422). Plaintiff returned on September 16, 2004 for follow-up, and was instructed to stay as active as tolerated. (Tr. 418-20).

Medical records from John Interlandi, M.D., an Endocrinologist, indicate that Plaintiff was seen on several occasions from June 22, 2004 to April 4, 2007 for diabetes management. (Tr. 210-48). On November 10, 2004, Plaintiff stated that her insulin pump needed adjustment. (Tr. 220). Dr. Interlandi noted the diagnoses of diabetes type 2 and morbid obesity, and noted that Plaintiff was to have gastric bypass

surgery.  (Id.)

Records from Hugh Houston, M.D. indicate that Plaintiff underwent gastric bypass surgery on December 8, 2004 at the Centennial Medical Center in Nashville, Tennessee. (Tr. 259-60). On January 20, 2005, Plaintiff saw Dr. Houston and reported severe diarrhea, and was hospitalized for treatment of dehydration. (Tr. 258).

Plaintiff returned to Dr. Sulkowski's office on January 6, 2005 with complaints of cough, congestion, and sore throat. (Tr. 415).

On March 9, 2005, Dr. Interlandi noted that Plaintiff had undergone gastric bypass and had lost 67 pounds, but was reporting diarrhea and dehydration.  (Tr. 219).

On March 14, 2005, Plaintiff saw Dr. Houston and reported symptoms related to dehydration, which Dr. Houston opined may be caused by gastroenteritis.  (Tr. 256).

On April 22, 2005, plaintiff saw Dr. Sulkowski for a second-degree burn on her right wrist sustained when adjusting the wheel height of her lawn mower.  (Tr. 413).

A June 24, 2005 MRI of Plaintiff's thoracic spine, performed at Stonecrest Medical Center in Smyrna, Tennessee revealed disc protrusion/herniation at the T5 through T8 levels. (Tr. 302).

On August 10, 2005, Teresa Zyglewska, M.D. wrote that Plaintiff suffered from lumbar and thoracic radiculopathy, and would benefit from continued physical therapy and particularly

aquatic therapy.  (Tr. 310).

On September 7, 2005, Plaintiff saw Dr. Sulkowski for follow-up of back pain, and it was noted that she was nearly pain free and had resumed doing most activities.  (Tr. 410-11).

On September 14, 2005, Plaintiff saw Dr. Interlandi and reported that she had visited the emergency room due to dehydration, (Tr. 218), and on March 22, 2006 reported the same. (Tr. 216).  On October 2, 2006, however, she told Dr. Interlandi that she had not had to seek further treatment for dehydration. (Tr. 215).

Plaintiff saw Dr. Sulkowski on several occasions from October 25, 2005 through April 12, 2007 for various complaints, including sinusitis, cough and congestion, muscle cramps, right knee pain, insomnia, burns, allergic rhinitis, and conjunctivitis (Tr. 383-408).

On June 27, 2007, Plaintiff saw Dr. Zyglewska with complaints of sleep disturbance and daytime sleepiness.  (Tr. 309). Dr. Zyglewska opined that Plaintiff most likely had a disturbance of her circadian rhythm due to shift work.  (Id.)  A sleep study was ordered, (Id.), and performed on July 11, 2007.  (Tr. 297-98). It revealed obstructive sleep apnea, and Plaintiff was given a continuous positive airway pressure ("C-PAP") machine.  (Tr. 308).

On July 12, 2007, Plaintiff saw Dr. Sulkowski for diabetes follow-up, and also complained of anxiety.  (Tr. 379). Dr. Sulkowski noted that Plaintiff appeared tense, was not in good

spirits, was tearful, and appeared tired. (Tr. 381). Dr. Sulkowski advised Plaintiff to talk with friends, family or a counselor, relax, exercise, and stop smoking. (Id.)

On July 21, 2007, Plaintiff presented to the emergency room of the Centennial Medical Center in Nashville, Tennessee and was seen by Terry Cain, M.D. with complaints of chest pain and high blood pressure. (Tr. 266). It was noted that a recent echocardiogram was normal. (Id.) Physical examination was normal, and Plaintiff was noted to be in no apparent distress. (Id.) EKG, chest x-ray, cardiac enzyme testing and laboratory test results were negative. (Id.) Dr. Cain's assessment was chest pain, and he noted that Plaintiff was a low-risk patient. (Tr. 266).

On August 9, 2007, Plaintiff was hospitalized at Centennial Medical Center "because she was pretty hyper and getting manic." (Tr. 270). Plaintiff reported that she had been trying to eat dinner and get to the pharmacy to get her medication when she perceived someone on her porch, and also reported that she was receiving prank telephone calls. (Id.) Plaintiff reported that the police initially refused to intervene, but eventually did after Plaintiff contacted the telephone company. (Id.) Plaintiff reported having a reaction from medication, which accounted for her current manic phase. (Id.) She reported working as an emergency room nurse. (Tr. 270). She also reported trouble with her fiancé, who had a limited education, was unwilling to undergo marriage counseling, and spoke limited English. (Id.) It was noted that Plaintiff's diabetes had resolved since her gastric bypass surgery.

(Id.)  She was diagnosed with bipolar affective disorder.  (Id.)

On August 10, 2007, Plaintiff was seen in consultation by David C. Heusinkveld, M.D., who noted Plaintiff's recent mental status changes consisting of increased symptoms of mania, anxiety and insomnia, and difficulty taking her medications.  (Tr. 268). Plaintiff complained of some nausea, abdominal discomfort due to a hernia, left hip pain, and urinary frequency, but stated that she drank 80 ounces of water each day.  (Id.)  She denied back pain. (Id.)  Upon examination, Plaintiff had active movement of her upper and lower extremities and intact strength.  (Id.)  Dr. Heusinkveld noted that Plaintiff had bipolar affective disorder and was experiencing increased mania.  (Tr. 268).

On August 20, 2007, Plaintiff returned to Dr. Sulkowski and reported that she had missed work after she was exposed to sewage while helping her fiancé repair a broken sewer line, and had developed a urinary tract infection and gastro-intestinal symptoms. (Tr. 376).  Plaintiff reported missing work due to separating from her fiancé, which caused an acute anxiety attack.  (Id.)  Plaintiff reported wanting to try some herbal teas that a neighbor gave her, and then stated that she began getting prank telephone calls that seemed to be from a stalker.  (Id.)  Plaintiff reported that she eventually met the stalker, who turned out to be the neighbor who had given her the herbal teas, and Plaintiff worried whether the teas had contained drugs.  (Id.)  Plaintiff also reported becoming ill at work following a reaction to medication.  (Tr. 376).

On September 6, 2007, Plaintiff saw Dr. Farooque for a

follow-up visit. (Tr. 313). Plaintiff complained that Geodon had a sedating effect. (Id.) She reported having been fired from her nursing job, and that she had applied for disability. (Id.) Plaintiff reported that she and her fiancé planned to marry the following month, as his divorce had been finalized, and that his four teenaged children would soon be coming from Mexico. (Id.) Plaintiff also stated that she wanted to have plastic surgery performed to remove a skin fold and abdominal hernia, and asked Dr. Farooque to write a letter to her plastic surgeon stating that she was emotionally stable. (Tr. 313). Plaintiff told Dr. Farooque that she was "looking for some kind of job" due to financial necessity. (Id.) Dr. Farooque wrote that he had suggested that Plaintiff not start working because she was not yet fully stable. (Id.)

On September 11, 2007, Plaintiff saw Dr. Sulkowski with complaints of right leg pain and recurring back pain. (Tr. 372-73). Upon examination, there was no edema or tenderness, and Plaintiff had normal range of motion, strength, reflexes, sensation and a normal gait. (Tr. 373). She was instructed to stay as active as possible and to use heat therapy and analgesics as needed. (Id.)

On September 13, 2007, Plaintiff saw Dr. Zyglewska for follow up. (Tr. 291). She reported good improvement with use of the C-PAP machine. (Id.) She complained of continued radicular symptoms, and MRI was ordered. (Id.) Plaintiff returned on September 17, 2007 and reported persistent pain in her low back and

thoracic area and, after discussing treatment options, elected to attempt treating the problem medically and with physical therapy exercises performed at home. (Tr. 289).

Plaintiff returned to Dr. Farooque on September 21, 2007, and reported complaints of pain. (Tr. 312). Dr. Farooque adjusted Plaintiff's Geodon prescription dosage. (Id.) Plaintiff reported having filed for disability and retaining a lawyer, and stated that she could not work. (Id.) Dr. Farooque also noted that he would write a letter, as Plaintiff had requested, to her plastic surgeon stating that Plaintiff was "psychiatrically stable to have any kind of plastic surgery procedure." (Id.)

Plaintiff returned to Dr. Farooque's office on September 24, 2007 and saw Renee Crecelius, a licensed social worker, for a therapy session with her fiancé. (Tr. 528). Ms. Crecelius noted that Plaintiff was very agitated, and noted that she continually made claims about being "sought." (Id.) Plaintiff described an incident where she was chased through a parking lot by someone in a black vehicle and filed police reports, but the police were not willing to help her. (Id.) Plaintiff reported that she was fired from her hospital job, and was filing a complaint against the hospital. (Id.) Plaintiff stated that she was trying to find other work, but that she did not feel able at present to function in a work setting. (Tr. 528). Plaintiff returned to Ms. Crecelius for a follow-up appointment and reported doing better with improvement in manic symptoms, and stating that Geodon was working well for her. (Tr. 527).

On October 30, 2007, Plaintiff saw Jeffrey W. Viers, M.A., for a mental status evaluation at the request of the Tennessee Disability Determination Services. (Tr. 315-21). Plaintiff reported that she had not worked since July 15, 2007, and that she had been fired for "continued inappropriate behavior" inasmuch as it had been "reported that she was leaving aggressive, angry messages on the telephone with her supervisor." (Tr. 315). Plaintiff reported having racing thoughts and aggressive behavior, and understood herself to be hyperactive. (Tr. 316). She reported bitterness and financial stress resulting from being fired. (Id.) She reported no treatment for psychiatric problems until recently. (Id.) She reported having done well in school, making and keeping friends, and earning an associate's degree in nursing and a Bachelor of Science degree in sound engineering and a certificate for data processing. (Tr. 317). She reported having worked in the past as a nurse, DJ, waitress, park ranger, janitor, and daycare center worker. (Id.) Plaintiff reported that she socialized with friends, family and neighbors, read books, listened to music, used a computer, attended church, played with her dogs, watched television, prepared and ate meals, cared for three dogs, did light mopping and sweeping, and sometimes made beds. (Tr. 318-19). She reported that she needed help and encouragement because she could not bend or stoop too much due to back problems and hernia repair, and stated that she did not do yard work. (Tr. 319). She reported that she drove a car, and left home one to three times per week. (Id.) She reported being able to attend doctor's

-14-

appointments alone, and that she was able to shop in stores and also by mail, telephone and computer, and that shopping could take 30 minutes to four hours. (Id.) She reported being able to pay bills, count change and use a checkbook, and stated that, while she had trouble getting along with family, friends and neighbors, she did not have trouble getting along with authority figures. (Id.) Plaintiff stated that she had anxiety regarding "being stalked and attacked again" and then stated that she had problems related to her back, "broken neck history," bowel and bladder incontinence, diabetes, hypertension, lower extremity edema, chronic bronchial asthma, insomnia, and confusion. (Tr. 319). Following his examination, Mr. Viers opined that Plaintiff's mood was labile between expansiveness and irritability, and that her presentation was consistent with her reports and treatment records. (Tr. 320). Mr. Viers opined that Plaintiff had moderate concentration difficulties due to tangential thoughts, and was moderately impaired in social interaction due to hyperactivity, pressured speech and racing thoughts. (Id.) Mr. Viers opined that Plaintiff would have moderate difficulty tolerating stress and taking normal precautions in a workplace. (Id.) He indicated his diagnosis as bipolar I disorder, most recent episode manic, in partial remission. (Id.)

On November 7, 2007, Plaintiff saw Emelito Pinga, M.D., for a disability evaluation at the request of the Tennessee Disability Determination Services. (Tr. 323-31). Plaintiff gave a history of having sharp pain in her neck, lower back, bilateral

knees and right ankle, and also of having pain, numbness and tingling in her fingers. (Tr. 324-25). Plaintiff reported that testing had revealed problems in these areas. (<u>Id.</u>) She gave a history of developing shortness of breath and chest pain, and stated that she was diagnosed with diabetes and hypertension in 1998. (Tr. 325). Dr. Pinga noted that Plaintiff's blood pressure was under control. (<u>Id.</u>) He noted that plaintiff was obese, but was dieting. (Tr. 326). Plaintiff reported that she smoked one-half of a pack of cigarettes per day. (<u>Id.</u>)

Upon examination, Dr. Pinga noted that Plaintiff was normally groomed, and had no difficulty moving from a chair to the examining table. (Tr. 328). Dr. Pinga observed Plaintiff to have good dexterity, and that she was able to remove and replace her shoes and socks and the cap on one of her medication bottles. (<u>Id.</u>) Dr. Pinga observed traces of leg edema over both lower extremities, but no calf tenderness. (Tr. 330). There was no muscle atrophy in Plaintiff's extremities. (<u>Id.</u>) Plaintiff had no swelling or deformities of any of her joints, and Dr. Pinga noted no inflammation or deformities in Plaintiff's hands. (Tr. 329). There was no lumbar spasm or tenderness, and straight leg raise testing was negative. (<u>Id.</u>) Dr. Pinga's clinical impression was degenerative arthritis of the cervical and lumbar spine; degenerative disc disease at L5-S1; degenerative arthritis of the right and left knee and the right ankle; carpal tunnel syndrome of the fingers bilaterally; sleep apnea; asthma; type 1 diabetes controlled with insulin; hypertension controlled with medication;

and obesity. (Tr. 330-31). Dr. Pinga opined that, in an eight-hour workday, Plaintiff could sit for six hours and walk or stand for four, and that "there would be limitations in the occasional lifting of weights of 10 pounds within an 8-hour workday cumulatively with rest periods of 15 minutes within a 1-hour interval." (Tr. 331).

On November 16, 2007, Plaintiff returned to Dr. Farooque's office for a follow-up visit. (Tr. 524, 526). Plaintiff saw Ms. Crecelius, and reported that she had done much better since her last session. (Tr. 524). Ms. Crecelius noted that Plaintiff's mood was stable, Plaintiff's behavior was appropriate, and she was compliant with her medications. (Id.) Plaintiff stated that she would like to return to work, and also stated that she had undergone hernia surgery and was doing well. (Id.) Plaintiff indicated that she wished to bring her future husband's teenaged children to live in the United States, and Ms. Crecelius pointed out that doing so would cause the children to undergo a serious adjustment reaction, but that Plaintiff was motivated and unwilling to change her mind. (Id.)

Also on this date, Plaintiff was seen by Dr. Farooque, and reported doing much better and stated that she wished to return to work. (Tr. 526). She told Dr. Farooque about her plan to get married and bring her husband's children to live in the United States, and Dr. Farooque wrote that he discussed this with Plaintiff and noted that many problems would result from doing so, but that Plaintiff expressed confidence that she could handle all

of the problems. (Id.) Plaintiff told Dr. Farooque that she wanted to return to work, and Dr. Farooque wrote a letter stating that Plaintiff was doing better and could "return to her work after Friday, November 30, 2007 without any restriction." (Tr. 525).

On January 11, 2008, Plaintiff returned to Dr. Farooque's office and saw Ms. Crecelius and Dr. Farooque. (Tr. 522-23). Dr. Farooque noted that Plaintiff was doing pretty well, and that "[i]n fact this is the best shape I have seen her in a long time." (Tr. 523). Dr. Farooque noted that Plaintiff was compliant with her medication and had no psychiatric complaints, but did complain of feeling weak. (Id.) Dr. Farooque suggested that Plaintiff see her primary care physician to rule out anemia. (Id.) Ms. Crecelius noted that Plaintiff appeared to have a flat affect. (Tr. 522). Plaintiff told both Ms. Crecelius and Dr. Farooque that she was looking for a job online but was not getting any hospital jobs. (Tr. 522-23). Dr. Farooque suggested that Plaintiff try applying at nursing homes, where it would be easier for her to find a job, (Tr. 523), and Ms. Crecelius suggested that Plaintiff look for a job somewhere she had not worked in the past. (Tr. 522). Ms. Crecelius also advised Plaintiff to begin socializing more outside her home. (Id.) Plaintiff denied any feelings of hopelessness. (Tr. 522). Plaintiff told both Ms. Crecelius and Dr. Farooque that she planned to marry her boyfriend in the next six months, and then bring all of his children to live in the United States. (Tr. 522-23).

On January 30, 2008, Mason D. Currey, Ph.D. completed a

Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique form. (Tr. 336-53). Dr. Currey determined that Plaintiff had bipolar syndrome and "moderate" difficulties/limitations in the following areas: maintaining social functioning, maintaining concentration, persistence or pace, understanding and remembering instructions, carrying out detailed instructions, maintaining attention and concentration, working in coordination with/proximity to others without being distracted, completing a normal workday and workweek, interacting appropriately with the general public, accept instructions and respond to criticism from supervisors, get along with coworkers, and respond appropriately to workplace setting changes. (Tr. 350-51). For all other areas, Dr. Currey found that Plaintiff was "not significantly limited." (Id.) Dr. Currey wrote that Plaintiff could "concentrate and persist for simple and low level detailed tasks despite some but not substantial difficulty;" that Plaintiff would "have some but not substantial difficulty interacting with coworkers, the public and supervisors; and that she could "adapt to infrequent change." (Tr. 352).

On February 13, 2008, Denise P. Bell, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. 354-61). Dr. Bell opined that Plaintiff could occasionally lift 50 pounds and could frequently lift 25; could sit and could stand and/or walk for six out of eight hours; and could push and/or pull without limitation. (Tr. 355). Dr. Bell noted the November 7, 2007 medical assessment and opined that it was too restrictive,

given the findings of normal strength, normal gait and essentially full range of motion of all joints. (Tr. 360).

On March 24, 2008, Plaintiff saw Dr. Sulkowski and reported that Geodon seemed to be helping her bipolar symptoms. (Tr. 369-70). Plaintiff's blood pressure was normal, and she reported that she was taking her hypertension medications and had no side effects. (Tr. 370). Examination was normal, Plaintiff was found to be relaxed and in good spirits, and she was advised to talk with friends, family or a counselor, and to exercise. (Tr. 370-71).

Plaintiff returned to Dr. Farooque on April 4, 2008. (Tr. 521). Dr. Farooque noted that Plaintiff was "doing exceptionally well" and was taking only Geodon. (Id.) Plaintiff denied having any mania, mood swings, or depression, and mentioned that she had unsuccessfully applied for disability. (Id.) Plaintiff reported that she had gotten married "last month" and was happy. (Id.) She expected that her husband's children would come from Mexico in six to twelve months' time, and understood that there would be difficulties then. (Tr. 521). Plaintiff denied having any drowsiness from the Geodon. (Id.)

On June 27, 2008, Plaintiff saw Dr. Sulkowski with complaints of fatigue, anemia and weakness. (Tr. 563-65). Dr. Sulkowski noted that Plaintiff's blood pressure was normal, and that she had a history of iron deficiency anemia and needed a recheck. (Id.) Plaintiff was advised to continue her current medications and to exercise regularly and follow a low salt and low

fat diet.  (Tr. 565).

On August 1, 2008, Reeta Misra, M.D. completed a Physical Residual Functional Capacity Assessment form.  (Tr. 531-38).  Dr. Misra opined that Plaintiff could occasionally lift 50 pounds and could frequently lift 25; could sit and could stand and/or walk for six out of eight hours; and could push and/or pull without limitation.  (Tr. 532).  Dr. Misra opined that Plaintiff should only "occasionally" climb a ladder, rope or scaffold but could "frequently" perform all other postural maneuvers, (Tr. 533), and assigned no manipulative, visual, communicative, or environmental restrictions.  (Tr. 534-35).  Dr. Misra noted that Plaintiff's sleep apnea was controlled with use of the C-PAP and that she had had normal examinations and had demonstrated good range of motion and strength, and determined that Plaintiff's allegations were partially credible in light of the medical evidence of record. (Tr. 538).

On August 12, 2008, P. Jeffrey Wright, Ph.D. completed a Psychiatric Review Technique form.  (Tr. 539-52).  Dr. Wright opined that Plaintiff had bipolar disorder in partial remission, and opined that Plaintiff had "moderate" difficulties/limitations in maintaining social functioning, and maintaining concentration, persistence or pace. (Tr. 549).  On his Mental Residual Functional Capacity Assessment form, Dr. Wright opined that Plaintiff was "moderately limited" in the following areas: carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule and maintaining

regular and punctual attendance, completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace, interacting appropriately with the general public, getting along with coworkers and peers, and responding appropriately to changes in the work setting. (Tr. 553-54). Dr. Wright found "mild" or no limitations in all other areas. (Id.) Dr. Wright opined that Plaintiff's statements about her limitations were only partially credible because the severity alleged was not completely consistent with the objective medical findings. (Tr. 551).

On October 14, 2008, plaintiff was seen by Dr. Sulkowski and stated that she had been taking her medications regularly, and had no side effects. (Tr. 575-76). Dr. Sulkowski stated that review of plaintiff's systems were all negative, and that her bipolar disorder symptoms were "slowly getting controlled and better." (Tr. 546). Examination was negative. (Id.)

Plaintiff returned to Dr. Farooque on November 7, 2008 for a follow-up visit. (Tr. 557). Dr. Farooque noted that Plaintiff was doing very well, and was calm and composed, and her mood and affect were stable. (Id.) Dr. Farooque wrote that it appeared that Plaintiff had been "pretty much okay" for the past year. (Id.) Dr. Farooque wrote that he advised Plaintiff to begin looking for part-time work. (Id.)

Plaintiff saw Dr. Farooque again on March 16, 2009. (Tr. 558). Dr. Farooque noted that Plaintiff's mother had written him a letter to say that Plaintiff was depressed, but Dr. Farooque

noted that Plaintiff did not appear to be as depressed as described in the letter. (Id.) Dr. Farooque noted that Plaintiff was having anxiety and seemed depressed; prescribed Prozac;[4] and advised her to return in six months. (Id.)

On March 30, 2009, plaintiff was seen by Dr. Sulkowski and stated that she had experienced an allergic reaction to herbal teas given to her by her neighbor who turned out to be a stalker. (Tr. 580). Plaintiff complained of post-traumatic stress resulting from the stalking, exacerbation of a hernia, anxiety and memory problems. (Id.) It was noted that plaintiff's bipolar disorder was under less-than-optimal control, and she was advised to continue on her current medication regimen and to talk with friends, family, or a counselor. (Tr. 581).

Plaintiff returned to Dr. Farooque on September 14, 2009. (Tr. 559). Dr. Farooque noted that Plaintiff was doing "more or less okay," but that Plaintiff opined that she could not work due to lack of concentration. (Id.) Dr. Farooque increased Plaintiff's Prozac dosage, and advised her to find a psychiatrist closer to her home. (Id.)

Also on September 14, 2009, plaintiff saw Dr. Sulkowski with complaints of lower moderate back pain. (Tr. 585). Range of motion was decreased by 20 degrees and plaintiff was tender over her lower lumbar spine. (Tr. 586). However, there was no muscle spasm, straight leg raise testing was negative bilaterally,

---

[4]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

plaintiff had normal strength and normal sensation bilaterally, and her gait was within normal limits. (Id.) Plaintiff was instructed to stay as active as she could tolerate, and to use over-the-counter analgesics and heat therapy and return in six to twelve months. (Id.) On this date, Dr. Sulkowski completed a Physical Medical Source Statement. (Tr. 560). Dr. Sulkowski noted that he had treated Plaintiff for chronic back pain, (Tr. 562), and opined that she could lift and/or carry ten pounds frequently and 25 pounds occasionally and, in an eight-hour workday, could stand and/or walk for three hours and could sit for four. (Tr. 560). Dr. Sulkowski opined that Plaintiff should never crawl, but could either occasionally or frequently perform all other postural and manipulative maneuvers. (Tr. 561). Dr. Sulkowski opined that Plaintiff should avoid moderate exposure to most environmental factors, and stated that Plaintiff would need to lie down or recline three to four times per day for 30 to 60 minutes. (Id.) Dr. Sulkowski opined that Plaintiff's use of medication or medication side effects did not cause any other limitations. (Id.)

### III.   The ALJ's Decision

The ALJ in this case determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, and that she had the severe impairments of degenerative disc disease, degenerative joint disease, carpal tunnel syndrome, obstructive sleep apnea, asthma, diabetes mellitus, hypertension, coronary artery disease, obesity and bipolar disorder. (Tr. 12).

The ALJ determined that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a listed impairment. (Id.)

The ALJ determined that plaintiff retained the residual functional capacity to perform a range of light work as defined in 20 C.F.R. § 404.1567(b). (Tr. 14). The ALJ explained that plaintiff could lift/carry/push/pull up to 20 pounds occasionally and ten pounds frequently; stand/walk for 30 minutes at a time and a total of four hours in an eight-hour day; and sit for one hour at a time and for a total of six to eight hours in an eight-hour day. (Id.) The ALJ determined that, after standing/walking for 30 minutes or sitting for one hour, Plaintiff would need to change position for a minute or two. (Id.) The ALJ determined that Plaintiff could "perform simple routine tasks that can be performed independently and that [involved] no more than superficial interaction with co-workers, supervisors and the general public." (Id.)

The ALJ determined that, due to Plaintiff's need for simple repetitive work with limited interpersonal contact, Plaintiff was unable to perform her past relevant work as a registered nurse. (Tr. 19).

Considering the fact that Plaintiff's ability to perform the full range of light work was impeded by additional limitations, the ALJ considered the vocational expert's testimony and concluded that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national

economy. (Tr. 20-21). The ALJ concluded that Plaintiff had not been under a disability as defined by the Act at any time from Plaintiff's alleged onset date through the date of the decision. (Tr. 21).

## IV. Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. <u>See</u> 42 U.S.C. §§ 423(d)(1)(A) (defining "disability" for DIB purposes). The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." <u>Id.</u> It further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." 42 U.S.C. §§ 423(d)(2)(A); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S.

458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young

o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance but enough that a reasonable person would find  adequate to support the conclusion.  Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the  Court  must  review  the  entire  administrative  record  and consider:

     1.    The credibility findings made by the ALJ;

     2.    The plaintiff's vocational factors;

     3.    The medical evidence from treating and consulting physicians;

     4.    The  plaintiff's  subjective  complaints relating to exertional and non-exertional activities and impairments;

     5.    Any corroboration by third parties of the plaintiff's impairments;

     6.    The testimony of vocational experts, when required,  which  is  based  upon  a  proper hypothetical  question  which  sets  forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings."  Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However,  where  substantial  evidence  supports  the  Commissioner's

decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003) (citing <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)).

In the case at bar, Plaintiff states that she "does have a combination of impairments equal to a listing (20 C.F.R. §404.1501, et seq., Appendix 1)." (Docket No. 18 at 6). Plaintiff also states that she has more than one impairment, and notes that the "symptoms, signs and findings for the impairment are to be considered in combination to determine if Plaintiff meets a listed impairment." (<u>Id.</u>) Plaintiff does not, however, specify which listing she feels she meets, or identify which impairment or combination of impairments it is that she feels meets or medically equals a listing. Plaintiff also states that the ALJ improperly assessed her residual functional capacity inasmuch as he "made vague reference to Plaintiff's medical records, without indicating which portion of the medical evidence he relied upon in determining Plaintiff's residual functional capacity." (<u>Id.</u> at 8). In response, the Commissioner contends that the ALJ's decision is based upon substantial evidence on the record as a whole.

A.   <u>Listed Impairments</u>

In the case at bar, at the third step of the sequential evaluation process, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal a listed impairment. Plaintiff states that she does have a combination of impairments equal to a listing, but does

-29-

not state which listing or listings she feels she meets or medically equals, nor does she provide analysis of the relevant law or facts regarding the ALJ's decision regarding any of the listings cited. Review of the decision reveals no error.

"To qualify for disability under a listing, a claimant carries the burden of establishing that [her] condition meets or equals all specified medical criteria." McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (citing Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995)). A claimant will not be deemed to have met a listing merely because she has been diagnosed with a condition named in a listing and meets some of the criteria. Id. at 612; see also Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.") While an ALJ is required to consider evidence of listed impairments and determine whether they meet or are equivalent to any of the listed impairments, "[t]he fact that the ALJ d[oes] not elaborate on this conclusion does not require reversal [where] the record supports h[is] overall conclusion." Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (internal citations omitted).

In the case at bar, the ALJ determined that there was insufficient evidence to establish a finding of disability under Listings 1.02 (major dysfunction of a joint(s) due to any cause), 1.04 (Disorders of the Spine), 3.03 (Asthma), 4.04 (Ischemic Heart Disease), 9.08 (Diabetes Mellitus), or 12.04 (Affective Disorders). (Tr. 12). The evidence of record supports that finding.

As the Commissioner correctly notes, and as noted in the above summary of the medical information of record, Plaintiff's medical records documented, on a consistent basis, that Plaintiff exhibited normal gait, range of motion, and muscle strength, and that she had no muscle atrophy or spasm, and that straight leg raise testing was consistently negative. (Tr. 329-30, 373, 390, 399, 402, 411, 586). While Plaintiff did intermittently complain of back pain, she did not receive regular, ongoing medical treatment for a back disorder during the time period relevant to her application; in fact, she testified that her back "act[ed] up on" her a "couple of times a year." (Tr. 15, 40-42). Plaintiff's lungs were repeatedly noted to be clear, (Tr. 370, 377, 380, 390, 393, 402, 564), and cardiac examination repeatedly revealed a normal heart rate and rhythm, with no murmur, gallop, click or rub; and cardiac catheterization testing was normal, as was EKG, chest x-ray, and cardiac enzyme testing. (Tr. 370, 377, 380, 387, 390, 393, 402, 518, 564). Her diabetes was controlled by diet following her bariatric surgery, (Tr. 381), and her mental health treatment notes showed that she responded well to medication and was repeatedly noted to be doing very well. (Tr. 369-70, 371, 377, 521-27, 546, 557-59). In fact, in November of 2007, Dr. Farooque released Plaintiff to return to work without restriction, (Tr. 525), and agreed to write a letter on her behalf stating that she was psychiatrically stable. (Tr. 312).

To the extent Plaintiff can be understood to challenge the ALJ's consideration of her impairments in combination, the

undersigned determines that there was no error.  As noted above, the ALJ fully summarized all of plaintiff's medical treatment records and the opinion evidence of record, and discussed each of plaintiff's alleged impairments.  The ALJ wrote that he had concluded that plaintiff did not have "an impairment or combination of impairments that [met] or medically [equaled]" a listed impairment.  (Tr. 12).  Based on the foregoing, the undersigned finds that the ALJ sufficiently considered plaintiff's impairments in combination.  See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (conclusory statement that ALJ did not consider combined effects of impairments was unfounded where ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity); see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (the ALJ sufficiently considered the claimant's impairments in combination by separately discussing the claimant's physical impairments, complaints of pain, and daily activities).  "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable."  Id. (citing Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)).

Review of the record reveals no error in the ALJ's conclusion that Plaintiff's impairments, either alone or in combination, failed to meet or medically equal a listed impairment. The undersigned therefore rejects Plaintiff's conclusory assertion to the contrary.  See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) (summarily rejecting the claimant's conclusory assertions that the ALJ committed error in considering whether he

met certain listings).

B.    The ALJ's Residual Functional Capacity Assessment

Plaintiff herein states that the ALJ made only "vague reference" to her medical records without indicating the portion thereof he was relying on in determining her residual functional capacity. (Docket No. 18 at 8). Again, Plaintiff's challenge is little more than a conclusory statement that the ALJ erred. Plaintiff does not specify what medical information she feels was referenced vaguely, nor does she identify any medical information that she feels is contrary to the ALJ's findings. Plaintiff's contention is without merit.

Residual functional capacity (also "RFC") is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712.  However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863.  In addition, while an ALJ is required to develop the record fully and fairly, he is not required to discuss every piece of evidence submitted."  Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).  "Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id.  The claimant bears the burden of establishing her RFC.  Goff, 421 F.3d at 790.

In determining Plaintiff's RFC, the ALJ in this case thoroughly discussed and analyzed the medical evidence of record, including the results of objective testing, the medical opinion evidence, and the type and effectiveness of the treatment Plaintiff received, and  discussed how the evidence related to Plaintiff's testimony concerning her alleged impairments.  The ALJ also fully explained the reasoning behind his RFC determination.  The ALJ was specific regarding how he was weighing the medical opinion evidence, and the reasons for the weight assigned.  It cannot be said that the ALJ made only "vague reference" to Plaintiff's medical evidence, nor can it be said that the ALJ failed to

indicate the weight given to the opinion evidence.[5]

The ALJ noted Plaintiff's treatment with Dr. Zyglewska for back pain and carpal tunnel syndrome and the results of MRI reports generated during this period, along with Plaintiff's complaints of long-standing back problems. (Tr. 16). The ALJ noted that, while testing revealed disc bulging, Plaintiff worked for much of that time as a registered nurse at a medium to high exertional level. The ALJ concluded that the fact that Plaintiff worked successfully through many of those complaints did not support her contention that her back pain was debilitating. This finding is supported by the record, inasmuch as there is no medical evidence indicating any significant deterioration in Plaintiff's back condition. See Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) (citing Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (the fact that the claimant worked with her impairments, coupled with the absence of evidence of significant deterioration in her condition, demonstrates that the impairments are not disabling in the present). The ALJ also noted that Plaintiff was

_____

[5]Although Plaintiff herein does not challenge the ALJ's credibility determination, she does challenge the ALJ's RFC determination. Because the ALJ must first evaluate a claimant's credibility before determining her RFC, Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned conducted a full analysis of the ALJ's credibility determination. In assessing Plaintiff's credibility, the ALJ acknowledged his duty to consider all of the evidence of record relevant to Plaintiff's complaints, cited Regulations and Social Security Rulings corresponding with the Eighth Circuit decision in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), and set forth numerous inconsistencies in the record detracting from Plaintiff's credibility. Where adequately explained and supported, credibility findings are for the ALJ to make. See Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000). The undersigned has carefully reviewed the record, and believes that the ALJ's finding that Plaintiff's subjective complaints were not fully credible to the extent they were inconsistent with his residual functional capacity findings was adequately explained, and was supported by substantial evidence on the record as a whole.

not undergoing treatment for an alleged back impairment. (Tr. 15, 40-42). A lack of ongoing treatment is inconsistent with allegations of a disabling condition. <u>Walker v. Shalala</u>, 993 F.2d 630, 631-32 (8th Cir. 1993) (An ALJ may consider the lack of ongoing medical treatment as inconsistent with complaints of a disabling condition).

The ALJ also discussed and analyzed the medical evidence as it related to Plaintiff's mild-to-moderate carpal tunnel syndrome, and to her right knee osteoarthritis, which the ALJ noted was reportedly stable and did not interfere with walking. (Tr. 16). The ALJ also noted the medical information concerning Plaintiff's asthma, noting that she had not required emergency room treatment or hospitalization. (<u>Id.</u>) The ALJ noted that Plaintiff had undergone a successful gastric bypass surgery, and that her hypertension, anemia, diabetes, and sleep apnea were controlled with treatment. (Tr. 16-17). The ALJ noted that the results of cardiac catheterization, EKG testing, and angiogram were either normal, or revealed only minimal findings that did not indicate the need for intervention. (Tr. 17). While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles v.</u>

_Sullivan_, 902 F.2d 657, 659 (8th Cir. 1990) (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time).

The ALJ also discussed Plaintiff's mental health treatment with Dr. Farooque and her single hospitalization, along with her testimony regarding her mental health. (Tr. 17-18). The ALJ noted Dr. Farooque's opinion that Plaintiff was doing "exceptionally well" and that she was responding to medication. See _Brown v. Astrue_, 611 F.3d 941, 955 (8th Cir. 2010)(quoting _Brace v. Astrue_, 578 F.3d 882, 885 (8th Cir. 2009) (noting that if "an impairment can be controlled by treatment or medication, it cannot be considered disabling"). The ALJ discussed Plaintiff's obesity, and concluded that it did not appear to be a factor in her other impairments to any overt degree. (Tr. 17); see _Brown ex rel. Williams v. Barnhart_, 388 F.3d 1150, 1153 (8th Cir. 2004) (finding that the ALJ sufficiently considered a claimant's obesity where the ALJ specifically referred to it in his decision).

The ALJ also thoroughly discussed the opinion evidence of record. The ALJ discussed Plaintiff's consultative examination with Dr. Pinga, noting that his examination revealed an essentially normal musculoskeletal examination, negative straight leg raising, normal range of motion and normal gait, and that he concluded that Plaintiff could sit for six of eight hours per day, walk or stand for four of eight hours per day and lift as much as ten pounds occasionally. (Tr. 16-17). The ALJ wrote that he was giving Dr. Pinga's opinion significant weight because it was consistent with

the medical evidence of record, but that he had given greater weight to Plaintiff's testimony that her back surgeon limited her to lifting 20 pounds occasionally. (Tr. 17).

The ALJ exhaustively discussed Plaintiff's consultative examinations with Mr. Viers and with Drs. Currey and Wright, and wrote that he was giving these opinions significant weight and was accommodating the limitations indicated in his residual functional capacity, inasmuch as he had specified that Plaintiff could perform simple routine tasks that could be performed independently and that involved no more than superficial interaction with co-workers, supervisors, and the public. (Tr. 18-19). The ALJ also thoroughly discussed Plaintiff's evaluations by Drs. Bell, Misra, and Sulkowski. (Tr. 19). The ALJ wrote that he was giving little weight to the opinion of Drs. Bell and Misra regarding Plaintiff's ability to lift, stating that their opinions overestimated Plaintiff's abilities, and assigned lifting restrictions greater than those indicated. (Tr. 18-19). The ALJ thoroughly discussed Dr. Sulkowski's medical source statement, and fully explained the weight given. (Tr. 19). The ALJ explained that he was giving some weight to Dr. Sulkowski's opinions regarding exertional and postural activity, inasmuch as those opinions were generally within the limits established by the medical evidence of record, but was giving little weight to Dr. Sulkowski's opinion that Plaintiff would need to lie down for half of the day. (Id.) The ALJ explained that Dr. Sulkowski's opinion regarding Plaintiff's need to lie down was inconsistent with the balance of the record as a

whole, and was also inconsistent with Dr. Sulkowski's own opinion, inasmuch as the number of hours Dr. Sulkowski opined Plaintiff could spend sitting, standing and walking totaled approximately seven of eight hours per day, which did not allow for four hours of lying down. (Id.); see Goff, 421 F.3d at 790 (an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions).

A review of the ALJ's determination of Plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ based his decision on all of the credible, relevant evidence of record and, despite Plaintiff's suggestion to the contrary, properly explained the weight given to the medical evidence. For the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons, on the claims that Plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could

have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.  2001); <u>Browning</u>, 958 F.2d at 821.


Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of January, 2012.